Filed 9/12/23  P. v. Parker CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PHINEHAS LAMONT PARKER,<br><br>    Defendant and Appellant. | F084858<br><br>(Super. Ct. No. 140540)<br><br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Dawna Reeves, Judge.

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Meehan, Acting P. J., Snauffer, J. and DeSantos, J.

## INTRODUCTION

Appellant and defendant Phinehas Lamont Parker (defendant) was convicted after a jury trial of premeditated attempted murder and additional felony offenses, with firearm and great bodily injury enhancements. He was sentenced to life with the possibility of parole plus a determinate term of 35 years eight months.

In 2022, the trial court denied defendant's Penal Code[1] section 1172.6 petition for resentencing. On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to both *People v. Delgadillo* (2022) 14 Cal.5th 216 and *People v. Wende* (1979) 25 Cal.3d 436. Appellant submitted a supplemental brief raising several issues. We review the court's ruling, address defendant's contentions, and affirm the trial court's denial of his petition.

## FACTS[2]

Manuel Ruelas owns an automobile accessories store in Modesto. He lives with Chela Miller and their six children. On March 8, 1997, he brought home $9,000 in cash

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated. Appellant filed his petition in 2021 under former section 1170.95, which was substantively amended effective January 1, 2022, and renumbered as section 1172.6 without further change on June 30, 2022. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.) The trial court addressed the allegation in defendant's petition under the provisions of section 1172.6.

[2] The facts are from this court's nonpublished opinion in appellant's direct appeal in *People v. Parker* (Feb. 6, 2002, F033560 [nonpub. opn.]) (*Parker*), which the prosecutor attached as an exhibit in support of its opposition to defendant's petition.

In reviewing a section 1172.6 petition, the court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*Clements*, at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).) We cite to the factual statement from defendant's direct appeal to place his arguments in context, and do not rely on that factual statement to resolve his appeal from the trial court's order that found his petition did not state a prima facie case for relief.

2.

because he did not have time to make a bank deposit.[3]  Ruelas left the money in a pocket of his pants.

Ruelas and Miller went to sleep in the master bedroom; their newborn infant was sleeping in a bassinet near their bed.  Ruelas's pants were laying on the floor by the bed.  At approximately 3:00 a.m.,[4] they were awakened by two armed men wearing black ski masks and black clothing. The masks were too large and portions of the men's faces were exposed.  One of the men was Asian and one was Black.  The Black intruder wore rugged, black work boots.

The men pointed their guns at Ruelas and Miller, telling them to lie down on the ground.  They demanded that Ruelas tell them where he kept his money and his gun, and threatened to kill him if he did not tell them.  Ruelas insisted there was no money in the house.  They rifled through the room looking for cash.

The Asian man grabbed Ruelas's watch and a gold chain with an attached crucifix from the top of a dresser.  The crucifix was set with diamonds and rubies.  He also took a silver belt buckle and a gold watch that belonged to Ruelas.

Frustrated by their inability to find Ruelas's money, the Asian man pointed the gun at Miller's vagina and at the baby's head, threatening to kill them if Ruelas did not tell them where he had hidden the money.  The Asian man then left the room and ransacked other parts of the house.

Meanwhile, the Black man found a new safe Ruelas had purchased.  He instructed Ruelas to open it.  Ruelas told him that he did not know the combination.  The Black man

---

**3**    There was some question about the source of the money as the defense attempted to characterize it as drug money.

**4**    Earlier that evening, at approximately 10:30 or 11:00 p.m., Billy McLain was walking down a street near their house when he observed three men wearing ski masks and black pants. One was crouched by a van and the other two were near the house. The men chased McLain and he ran home.

warned Ruelas that he would kill him if he found the money. He continued to search the room and eventually found the cash inside Ruelas's pants. He gave Ruelas a "weird look," and then shot him in the face from a distance of approximately five to six feet. The bullet passed through Ruelas's cheekbone, broke his collarbone and lodged in his left armpit. The Black man approached Ruelas and aimed the gun at Ruelas's forehead. Ruelas was still conscious. He begged the Black man to " 'Just go. Just go.' " The Black man walked away.

Miller was hiding behind a recliner. She escaped out a window and ran to a neighbor's house. Both she and Ruelas called 911. When the police arrived, the intruders were gone.

When Ruelas was interviewed by police at the hospital, he described the Black intruder as 5 feet 10 inches to 5 feet 11 inches tall, 180 pounds and 25 to 30 years old. At trial, Ruelas estimated that the Black intruder was approximately 6 feet 2 inches tall. Miller described the Black intruder to the investigating officers as 6 feet 2 or 6 feet 4 inches tall and in his 20's.

Defendant is Black and he was 25 years old when the crimes occurred. The parties stipulated that he is shorter than 6 feet 1 inches tall.

On March 12, 1997, defendant's girlfriend and later his wife, Clarissa Hurtado, sold a gold chain to a local pawnshop. It was recovered by the police. Ruelas and Miller identified the chain as the one stolen by the intruders.

On March 14, 1997, Hurtado sold a crucifix to a different pawnshop. The shop owner originally declined to take the piece because it was set with colored stones. Hurtado left the store briefly. When she returned, the stones had been removed. The owner purchased the crucifix and melted it down for scrap.

On March 21, 1997, Hurtado's residence was searched. A pair of black work boots, various articles of men's clothing, including three black T-shirts, and two letters addressed to defendant were all found in the master bedroom.

4.

Ruelas identified the boots found in Hurtado's residence as the same boots worn by the man who shot him. The boots were sent to the state crime laboratory for analysis. Dried blood was found on them. DNA taken from this blood was determined to be consistent with Ruelas's genetic profile.

On or about May 11, 1997, Ruelas and two other men were arrested for attempting to purchase pseudoephedrine (an ingredient used in the production of methamphetamine). Although charges were filed against Ruelas, they were eventually dismissed.

On August 16, 1998, the day before defendant's first[5] jury trial in this case, a deputy taped a jailhouse visit between defendant and Hurtado. A portion of the tape was introduced into evidence. During this visit defendant instructed Hurtado to fabricate a story about how she had obtained the chain and crucifix. Hurtado told defendant that she would testify that she had purchased the chain at a flea market a few years ago. She would describe the stones in the crucifix as being orange in color and not rubies. Hurtado held up pieces of paper to the glass separator during this conversation.

On October 20, 1998, two investigators from the district attorney's office stopped Hurtado outside the jail immediately after a visit with defendant. She wrestled with the men and tried to destroy a piece of paper she was holding by tearing it in half and stuffing it into her mouth.

Hurtado did not appear at trial. After the court declared her unavailable, the prosecution introduced her testimony from the second trial. She had testified that a man named Manuel had asked her to pawn a crucifix that was set with orange stones. She did so as a favor to him. She purchased the gold chain at few years ago at a flea market and decided to pawn it because she did not wear jewelry very often. Defendant stayed with her occasionally in March 1997, and she was pregnant with his child at this time. However, he was not living with her, and other men also stayed at her residence.

---

**5** Two mistrials occurred in this case. The first mistrial was declared after defendant threatened his attorney; the second was declared when defense counsel became ill.

Defendant did not testify. Defense counsel called one witness: defendant's mother, Denise Haynes. She testified that defendant was living with her in March 1997. She loaned defendant $500 to post bail for Hurtado that month.

## PROCEDURAL SUMMARY

On December 23, 1997, an information was filed in the Superior Court of Stanislaus County charging defendant with committing the following offenses on March 9, 1997: count 1, premeditated attempted murder of Ruelas (§§ 664/187); counts 2 and 3, robbery of Ruelas and Miller (§ 212.5); count 4, assault with a firearm on Miller (§ 245, subd. (a)(2)); and count 5, burglary (§ 459), with firearm, great bodily injury, and prior conviction allegations.

### Jury Instructions[6]

The jury was instructed with CALJIC No. 8.66, that the elements of count 1, attempted murder, were (1) a direct but ineffectual act was done by one person; and (2) the person committing the act "harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."

CALJIC No. 8.67 defined the special allegation alleged as to count 1, that the attempted murder was willful, deliberate, and premeditated.

> "If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true.
>
> " 'Willful' means intentional. 'Deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. 'Premeditated' means considered beforehand.
>
> "If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other

---

**6** The jury instructions from defendant's trial were augmented to the instant appellate record.

6.

condition precluding the idea of deliberation, it is attempt to commit willful, deliberate, and premeditated murder."

The jury was separately instructed on the elements of counts 2 through 5, robbery, assault with a deadly weapon, and burglary. The jury was not instructed on the felony-murder rule. As we discuss below, the jury was also instructed on principals, aiders and abettors, and the natural and probable consequences doctrine but only as to counts 2 through 5.

## Defense Counsel's Closing Argument

"Defense counsel argued in closing that this was a case of mistaken identity. He theorized that Ruelas was a drug dealer who had contact with unsavory characters who robbed and shot him. The intruders wore masks because Ruelas knew them from the drug trade. He pointed out that a shoeprint impression had been taken from the victim's bedroom. This print did not match the work boots. The person who shot Ruelas could have made this impression. The boots taken from Hurtado's residence were not specifically identified as belonging to defendant and Hurtado had testified that other men stayed with her. The boots could have belonged to one of them. Furthermore, defendant did not match the description of the Black intruder because he was less than 6 feet 1 inch tall. Also, defendant had to borrow money for Hurtado's bail, which is inconsistent with having just stolen $9,000 from Ruelas. In addition to all of the above, the DNA analysis was unreliable." (*Parker*, *supra*, F033560.)

## Convictions and Sentence

On April 26, 1999, defendant was convicted as charged of count 1, premeditated attempted murder, with the enhancements that he personally used a firearm (§ 12022.5) and personally inflicted great bodily injury on the victim in the commission or attempted commission of the offense (§ 12022.7); count 2, first degree robbery of Ruelas, with personal use and great bodily injury enhancements; count 3, first degree robbery of Miller, with the personal use enhancement; count 4, assault with a deadly weapon, and

7.

that he was armed with a firearm (§ 12022, subd. (a)); and count 5, first degree burglary, with the personal use enhancement; and a prior prison term enhancement.

On June 18, 1999, the trial court sentenced defendant to an indeterminate term of life in prison with the possibility of parole for count 1, plus a consecutive determinate term of 35 years eight months for the other convictions and enhancements.

**Direct Appeal**

On February 6, 2002, this court filed the nonpublished opinion in defendant's direct appeal. We rejected his claims of juror misconduct, prosecutorial misconduct, failure to dismiss the case, and alleged sentencing errors, and held the trial court was not required to give cautionary instructions about accomplice testimony because Hurtado was not an accomplice. (*Parker*, *supra*, F033560.)

We reversed defendant's conviction in count 3 for robbery of Miller because of insufficient evidence and ordered the sentence stricken. We also ordered the abstract of judgment corrected to state that defendant had to serve the determinate term and then the indeterminate term. As modified, we affirmed the judgment. (*Parker*, *supra*, F033560.)

An amended abstract of judgment was subsequently filed, which struck the conviction and term imposed for count 3, corrected defendant's aggregate determinate term to 31 years, and clarified that he would first serve the determinate term and then serve the indeterminate term of life with the possibility of parole.

**PETITION FOR RESENTENCING**

The instant appeal is from the denial of defendant's petition for resentencing, filed in propria persona on December 6, 2021, pursuant to former section 1170.95. Defendant requested appointment of counsel.

Defendant's supporting declaration consisted of a preprinted form where he checked boxes that stated (1) a complaint, information, or indictment was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) he was convicted of first or

8.

second murder pursuant to the felony-murder rule or natural and probable consequences doctrine, or pleaded guilty or no contest in lieu of a trial because he believed he could have been convicted under the felony-murder rule or natural and probable consequences doctrine; and (3) he could not presently be convicted of murder because of changes made to sections 188 and 189, effective January 1, 2019.

Defendant further checked boxes that declared he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of the murder; he was not a major participant or did not act with reckless indifference to life; and the victim was not a peace officer.

In addition to the petition, defendant filed a separate brief, in propria persona, that requested the trial court take judicial notice of the record from his jury trial, and raised numerous procedural and evidentiary claims of error that allegedly resulted in his conviction. He argued his conviction for attempted murder must be reversed for insufficient evidence because he was never identified as the perpetrator.

On January 11, 2022, the court appointed the public defender's office to represent defendant.

**The People's Opposition**

On January 20, 2022, the prosecution filed opposition and recited the facts from this court's opinion in the direct appeal. The prosecution acknowledged that defendant's petition for resentencing of his attempted murder conviction was cognizable under the amendments enacted by Senate Bill No. 775 (2021–2022 Reg. Sess.) that became effective on January 1, 2022. The prosecution further argued defendant was ineligible for relief because he was convicted as the actual shooter who committed the attempted murder, and the jury was not instructed on any theories of imputed malice.[7]

---

[7] Defendant filed his petition under the initial version of former section 1170.95, that permitted "a person with an existing conviction for felony murder or murder under the natural and probable consequences doctrine to petition the sentencing court to have the murder

9.

**Defendant's Reply Briefs**

On February 15, 2022, defendant's appointed counsel filed a reply brief and argued the petition stated a prima facie case for relief and an evidentiary hearing should be held.

On May 20, 2022, defendant separately filed, in propria persona, his own reply brief and argued the prosecutor's opposition created "a false narrative" because he was misidentified as the gunman at the jury trial. Defendant attached lengthy portions of the reporter's transcript from his jury trial in support of his argument that he was misidentified and his conviction should be reversed.

On July 7, 2022, the trial court heard and denied defendant's motion to discharge his appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.

## HEARING ON DEFENDANT'S PETITION

On July 28, 2022, the trial court held a hearing as to whether defendant's petition stated a prima facie case for relief. Defendant appeared via teleconference and his attorney was in the courtroom.

The trial court stated it had reviewed the pleadings and supporting exhibits, and invited argument. The prosecutor stated defendant was ineligible for resentencing because he was the person who fired the gun and committed the attempted murder.

---

conviction vacated and to be resentenced on any remaining counts if he or she could not have been convicted of murder as a result of the other legislative changes implemented by Senate Bill No. 1437." (*People v. Flores* (2020) 44 Cal.App.5th 985, 992.)

As noted above, effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) made substantive amendments to former section 1170.95, later renumbered as section 1172.6, and " '[c]larifie[d] that persons who were convicted of *attempted murder* or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories.' " (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18, italics added; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388; *People v. Saibu*, *supra*, 81 Cal.App.5th 709, 716, fn. 3.) The prosecution thus recognized that defendant's petition for resentencing of his attempted murder conviction was cognizable since the amended statute had become effective.

Defendant's counsel submitted on the pleadings. The court stated it would file a written order with its decision.

**The Trial Court's Denial of the Petition**

On July 29, 2022, the trial court filed an order that found defendant failed to state a prima facie case for relief and he was ineligible for resentencing as a matter of law. The court quoted part of this court's opinion from defendant's direct appeal, that defendant personally shot one victim in the face.

The court further found the charging information did not allege attempted felony murder or any theory of imputed malice, and the record of conviction showed defendant was charged and convicted as the direct perpetrator of the premeditated attempted murder who acted with specific intent.

> "The jury was instructed with [CALJIC Nos.] 8.66 and 8.67 which outlined the only theory of attempted murder advanced at trial; that the attempted killing was intentional, deliberate and premeditated, first degree attempted-murder. Further, in finding defendant guilty of attempted murder, the jurors specifically found true the allegations that the attempted killing was deliberate, intentional and premeditated. The jury verdicts also demonstrate their finding that Defendant *personally* used a firearm in the commission of the attempted murder and *personally* and intentionally inflicted great bodily injury on the victim. [Defendant] was convicted of attempted murder under a theory that remains in effect despite the changes to … Section 188 or 189 made effective January 1, 2019."

On August 22, 2022, defendant filed a timely notice of appeal.

## DISCUSSION

**I.  The Trial Court's Findings**

We first note that when defendant filed his petition, the trial court complied with section 1172.6 and appointed counsel, provided for further briefing, conducted a hearing on the petition, and stated reasons for denying the petition without issuing an order to show cause. (§ 1172.6, subds. (b), (c).)

11.

The prima facie inquiry under section 1172.6, subdivision (c) is "limited." (*Lewis*, *supra*, 11 Cal.5th at p. 971.) The court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*)

In denying defendant's petition, the trial court's order stated he failed to state a prima facie case for relief and was ineligible for resentencing as a matter of law. In doing so, however, the court quoted part of this court's opinion from defendant's direct appeal, that stated defendant personally shot one victim in the face. As explained above, the role of an appellate opinion is limited and the court cannot make factual findings when making the prima facie determination. To the extent the court relied on the factual summary contained in this court's prior opinion to find he failed to state a prima facie case, that reliance was erroneous. (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 292; *Lewis*, *supra*, 11 Cal.5th at p. 972.)

To demonstrate prejudice from the trial court's error, defendant must show it is reasonably probable that, absent the error, his petition would not have been denied without an evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972–974; *People v. Watson* (1956) 46 Cal.2d 818, 836.) In determining prejudice, we may review the record of conviction which includes the jury instructions (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251–1252; *People v. Offley* (2020) 48 Cal.App.5th 588, 599; *People v. Harden* (2022) 81 Cal.App.5th 45, 50, 54–55), the closing arguments, and the verdict. (*People v. Lopez* (2022) 78 Cal.App.5th 1, 13; *People v. Ervin* (2021) 72 Cal.App.5th 90, 106; *People v. Jenkins* (2021) 70 Cal.App.5th 924, 935.)

12.

We find the trial court's brief reference to the direct appeal was not prejudicial because the record of conviction shows defendant was ineligible for resentencing as a matter of law. The rest of the trial court's ruling to deny the petition was based on the instructions given at defendant's jury trial that defined the elements of premeditated attempted murder. "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; *People v. Perez* (2010) 50 Cal.4th 222, 224.) Defendant was correctly instructed with CALJIC Nos. 8.66 and 8.67 on the elements of attempted murder, that he had to act with the specific intent to kill, and the attempted murder "was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is an attempt to commit willful, deliberate, and premeditated murder." As we further explain below, the instructions also show that defendant was not convicted of premeditated attempted murder based on any theories of imputed malice.

## II. The Jury Instructions

We now turn to defendant's contentions raised in his letter brief.

## A. CALJIC Nos. 3.00 and 3.01

First, defendant contends his section 1172.6 petition stated a prima facie case for relief because the prosecutor relied on instructions defining aiding and abetting to convict him of attempted murder.

Defendant was charged and tried by himself. The trial court instructed the jury with CALJIC No. 2.11.5, that there was evidence a person other than the defendant "was or may have been involved" in the crimes, there may be reasons why that person was not on trial, and not to discuss or give any consideration as to why the other person was not being prosecuted in the trial.

13.

The trial court gave CALJIC No. 3.00, that persons who are involved in committing a crime are referred to as principals, and "[e]ach principal, regardless of the extent or manner of participation is *equally guilty*." (Italics added.) Principals were defined as "[t]hose who directly and actively commit the act constituting the crime," or "[t]hose who aid and abet the commission of the crime."

CALJIC No. 3.00 "generally stated a correct rule of law. All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.) However, the "equally guilty" language has been held misleading "if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding," and the pattern instruction has since been amended. (*Ibid.*; see, e.g., *People v. Nero* (2010) 181 Cal.App.4th 504, 517–520; *People v. Langi* (2022) 73 Cal.App.5th 972, 982–983.)

As discussed above, the jury was instructed that attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. The entirety of the instructions and the jury's guilty verdict establishes that it convicted appellant based on his own intent to kill, and not on any theories of imputed malice.

## B. CALJIC No. 3.02

Defendant next argues the jury was instructed on the natural and probable consequences doctrine because the court gave CALJIC No. 3.02. This instruction stated:

> "One who aids and abets another in the commission of crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.
>
> "*In order to find the defendant guilty of the crime of Assault with a Deadly Weapon, as charged in Count IV, you must be satisfied beyond a reasonable doubt that:*

14.

"(1) The crimes of robbery and burglary were committed;

"(2) That the defendant aided and abetted those crimes;

"(3) That a co-principal in that crime committed the crime of assault with a deadly weapon; and

"(4) The crime of assault with a deadly weapon was a natural and probable consequence of the commission of the crimes of robbery and burglary."

Defendant argues CALJIC No. 3.02 was sufficiently "general" so that the jury could have relied on the natural and probable consequences doctrine to convict him of all the charged offenses, including attempted murder, and he was thus eligible for resentencing.

Under the natural and probable consequences doctrine as it previously applied to aiding and abetting, "a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.)

In this case, however, CALJIC No. 3.02 expressly limited the natural and probable consequences doctrine to the target offenses of counts 2 and 3, robbery, and count 5, burglary, and identified count 4, assault with a deadly weapon, as the nontarget offense. The jury was not instructed that count 1, attempted murder, was one of the target or nontarget offenses, and it was not listed in CALJIC No. 3.02 to permit the jury to find him guilty of that offense based on the natural and probable consequences doctrine.

Defendant's contrary arguments ignore the plain language of the instruction, and we presume the jurors followed the trial court's instruction. (*People v. Houston* (2012) 54 Cal.4th 1186, 1211; *People v. Scott* (2015) 61 Cal.4th 363, 399.) We conclude the entirety of the instructions establish defendant was charged and convicted of premeditated attempted murder based on his own express malice and intent to kill, and not any theories of imputed malice.

15.

### III. Ineffective Assistance

Defendant argues the deputy public defender appointed to represent him in the section 1172.6 proceedings was biased against him and prejudicially ineffective. Defendant's arguments are based on the *Marsden* hearing that was held prior to the section 1172.6 hearing.

### A. *Marsden* hearing[8]

On January 11, 2022, the court appointed the public defender's office to represent defendant on his section 1172.6 petition.

On February 15, 2022, Deputy Public Defender Karen Kelly, defendant's attorney, filed a reply to the prosecution's opposition to defendant's petition, and argued the petition made a prima facie case for relief and an evidentiary hearing should be held.

On May 20, 2022, defendant, acting in propria persona, filed his own reply brief and argued his petition should be granted because he was misidentified as the gunman at his jury trial. Defendant attached lengthy portions of the reporter's transcript from the jury trial, and asked the trial court to review the transcript.

On July 7, 2022, the trial court conducted a hearing on defendant's *Marsden* motion to discharge his appointed counsel. At the hearing, defendant complained Kelly was not on "the same page" with him and she did not want to "bring to the court the issues that I wish to have brought to the court .…"

Defendant stated that he also had a conflict with the public defender's office that began before his jury trial. Defendant stated his first attorney was a deputy public defender who was later "removed" before his jury trial because the trial court claimed defendant threatened her. Defendant claimed Kelly was a close friend of his

---

[8] If defendant raises a *Marsden* issue on appeal, or an issue related to *Marsden*, the previously sealed transcript of the in camera hearing is subject to disclosure. (See Cal. Rules of Court, rule 8.47; *People v. Knight* (2015) 239 Cal.App.4th 1, 7–8.)

first attorney, and he believed Kelly would not fairly represent him in the current proceedings because of her alleged friendship with his prior attorney.

Kelly stated she only knew defendant's first attorney because they worked in the public defender's office at the time of defendant's jury trial. They may have met one time socially in 2010, but Kelly had never been to the first attorney's home, she did not have a friendship with the first attorney, that person had left the office, she was no longer in contact with that person, and they had never discussed defendant's case.

As for defendant's petition, Kelly said defendant believed he could raise identity issues from his trial in his section 1172.6 petition, and they disagreed on what arguments could be raised.

The court found no conflict and denied defendant's *Marsden* motion.

## B.  Analysis

Defendant's ineffective assistance arguments about his attorney's conduct in the section 1172.6 proceedings are based on his complaints about her at the *Marsden* hearing. The law governing a *Marsden* motion "is well settled. 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' " (*People v. Fierro* (1991) 1 Cal.4th 173, 204; *People v. Memro* (1995) 11 Cal.4th 786, 857.)

While the trial court must afford the defendant the opportunity to express specific reasons why he believes he is not being adequately represented, the court is not required to accept defendant's assertions of inadequate representation and may instead credit counsel's explanation. (*People v. Vera* (2004) 122 Cal.App.4th 970, 978–980; *People v.*

17.

*Webster* (1991) 54 Cal.3d 411, 436.) We review the denial of a *Marsden* motion under an abuse of discretion standard. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

The trial court did not abuse its discretion when it denied defendant's *Marsden* motion. Defendant's claim of an alleged prejudicial friendship between his current attorney, and the attorney who was initially appointed to represent him prior to his jury trial, was completely refuted by Kelly's uncontested statements to the court.

In addition, defendant's complaints about Kelly's failure to raise certain issues in his section 1172.6 petition were based on either a misunderstanding or misapprehension of the applicable law. Kelly cited defendant's supplemental reply brief—where defendant raised evidentiary issues from his jury trial—as indicative of their disagreement. "The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding.… The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.)

As explained above, the entirety of the record reflects defendant was ineligible for relief under section 1172.6 as a matter of law. Defense counsel correctly acknowledged that defendant could not raise claims of alleged trial error in his petition. Defendant's attorney was not ineffective for failing to raise meritless objections or motions. (*People v. Lucero* (2000) 23 Cal.4th 692, 732.)

## IV. Defendant's Contentions About His Jury Trial

Finally, defendant raises several procedural and evidentiary contentions about his jury trial, and claims the trial court failed to address these issues in ruling on his section 1172.6 petition.

18.

## A.  Procedural and Evidentiary Claims

Defendant raises additional ineffective assistance claims, but these arguments are based on the conduct of the defense attorney who represented him at his jury trial. Defendant also challenges the evidence at his jury trial, and that he was never identified as the perpetrator of the charged offenses, his conduct did not violate any criminal offenses, and the prosecution failed to show his intent.  Defendant further complains that at the hearing on his section 1172.6 petition, the trial court failed to consider the reporter's transcript from his jury trial that he filed with his petition, because these transcripts allegedly showed he was never identified as the perpetrator and his conviction must be reversed.

As we have explained, the purpose of section 1172.6 is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, " 'not to provide a do-over on factual disputes that have already been resolved.' "  (*People v. Farfan*, *supra*, 71 Cal.App.5th at p. 947.)  Section 1172.6 "does not permit a petitioner to establish eligibility on the basis of alleged trial error."  (*People v. DeHuff* (2021) 63 Cal.App.5th 428, 438.)  Defendant cannot relitigate trial issues in his section 1172.6 petition.

## B.  Section 745

Finally, defendant contends his convictions must be reversed under section 745 because the prosecution against him was allegedly racially motivated.

Section 745 was added to the Penal Code by the California Racial Justice Act of 2020 (CRJA), and was originally effective on January 1, 2021, and amended effective January 1, 2023.  (*People v. Thompson* (2022) 83 Cal.App.5th 69, 95, fn. 6.)  Under the CRJA, "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin."  (§ 745, subd. (a).)  Section 745 sets forth various categories of conduct "which, if proved, is enough to

19.

'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147.)

The CRJA applies to all cases where the judgments are not final. As of January 1, 2023, it also applies to cases where the defendant was sentenced to death, and to matters involving "immigration consequences related to the conviction or sentence." (§ 745, subd. (j)(1), (2).) Section 745 states that a claim under the CRJA shall be brought in the trial court in a pending case, a petition for writ of habeas corpus if judgment has been imposed, or a motion under section 1473.7 for those no longer in custody. (§ 745, subd. (b).)

Defendant's convictions became final in or about 2002, he was not sentenced to death, and there is no indication his case involved any immigration issues. Defendant did not file a separate motion or habeas petition raising a claim under the CRJA, as required by section 745. Instead, he has tried to bootstrap his alleged section 745 claim into the instant appeal from the denial of his section 1172.6 petition, by raising it for the first time in his supplemental letter brief. In his letter brief, he declares his convictions must be reversed under section 745 because he is African-American, he was allegedly profiled by law enforcement when he was arrested and charged, and the prosecution failed to prove he was the perpetrator at the jury trial. Defendant provides no authority to suggest he is authorized to seek relief under the CRJA in a section 1172.6 proceeding and we decline to address the issue.

## DISPOSITION

The court's order of July 29, 2022, denying defendant's section 1172.6 petition for resentencing, is affirmed.

20.